UNITED STATES DISTRICT COURT
WETERN DISTRICT OF NEW YORK

LARRY D. KINSEY,

                              Plaintiff,

                                                    Case No. 13-CV-6124-FPG

v.                                                  DECISION & ORDER

CAROLYN W. COLVIN,
Acting Commissioner of Social Security
Administration of the United States,

                              Defendant.

## I.    INTRODUCTION

*Pro se* Plaintiff Larry D. Kinsey ("Plaintiff") brings this action pursuant to Title XVI of

the Social Security Act ("SSA"), seeking review of the final decision of the Commissioner of

Social Security ("Commissioner"), which denied his application for Supplemental Security

Income ("SSI").  ECF No. 1.  The Court has jurisdiction over this matter under 42 U.S.C. §§

405(g) and 1383(c)(3).

Before the Court, currently, is the Motion for Judgment on the Pleadings consisting of a

Notice of Motion (ECF No. 10) and a Memorandum of Law in Support of the Defendant's

Motion for Judgment on the Pleadings (ECF No. 10-1) filed by Defendant pursuant to Federal

Rules of Civil Procedure 12(c).  Additionally, Defendant filed a Certificate of Service by Mail

stating, that on December 30, 2013, these filed documents were mailed by the United States

Postal Service to Plaintiff at the following address: 756 E. Main St., #1A, Rochester, New York

14605.  (ECF No. 10-2).  Plaintiff has not responded to the Defendant's motion.  The absence of

a response by Plaintiff does not relieve this Court of its obligation to review the decision of the

Commissioner.

For the reasons set forth herein below, I find that the final decision of the Commissioner is supported by substantial evidence within the record[1] and accords with applicable legal standards. Therefore, this Court grants the Commissioner's Motion for Judgment on the Pleadings, and orders that the Complaint be dismissed.

## II.   BACKGROUND

### A.  Procedural History

Plaintiff applied for SSI on March 1, 2010, alleging disability due to a seizure disorder and depression, with an onset date of December 31, 2009. Tr. 146-49. His application for SSI benefits was denied administratively on May 14, 2010. Tr. 52-59. On July 13, 2011, Plaintiff, represented by his attorney Ida M. Comerford, Esq., appeared and testified at a video administrative hearing held before Administrative Law Judge Vivian W. Mittleman ("ALJ"). Tr. 30-51. Vocational Expert James Newton ("VE") appeared and testified, as well. Tr. 47-49. At the conclusion of the administrative hearing, the ALJ held the record open for two weeks for Plaintiff's attorney's submission of additional evidence from the Department of Human Services' Work Experience Program ("WEP") and from Plaintiff's neurologist at the Anthony Jordan Health Center. Tr. 40-42, 49-50.

On October 13, 2011, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled. Tr. 9-24. The Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner on February 20, 2013. Tr. 1-3. Subsequently, Plaintiff timely commenced this action in the United States District Court for the Western District of New York appealing the Commissioner's decision.

---

[1] All references to the Administrative Record are reflected herein as ("Tr."), along with the associated page number(s).

**B.  Factual Background**

Plaintiff, who protectively applied for SSI benefits on March 1, 2010, was 48 years old, eleven days shy of his 49th birthday, at the time of the administrative hearing, had completed a GED, but had been in regular education in school, and had taken a janitorial course in 1992 while incarcerated.  Tr. 46, 170.  His employment history included work as a dishwasher, laborer, machine operator, production assistant, and receiving clerk.  Tr. 171, 186-189, 204, 219. Plaintiff indicated that he had not worked since 2009.  Tr. 171, 204, 219.

On the petition for SSI benefits, Plaintiff stated as the basis for relief seizure disorder and depression and alleged disability as of December 31, 2009.  Tr. 146.  On a form completed by Plaintiff on April 3, 2010, he stated that he lived alone in an apartment, had no problems with personal care, prepared his own meals daily, cleaned, did the laundry and ironing, and went shopping once a month for food.  Tr. 178-80, 181.  Preparing meals took 10 to 20 minutes.  Tr. 179.  Plaintiff stated that he went outside alone two or three times a week, and traveled by walking or using public transportation; he did not have a driver's license.  Tr. 180.  He could walk continuously for one or two miles, but needed to rest 10 to 20 minutes to continue walking. Tr. 183.  Plaintiff's listed hobbies included daily reading, watching television and listening to music.  Tr. 181.  Plaintiff indicated that he regularly talked to friends and went to appointments, but sometimes had problems getting along with family, friends, neighbors or others, and stayed home most days and evenings.  Tr. 182.  He also had problems getting along with bosses, teachers, police, landlords or others in authority, stating that "authority figures have given me trouble most of my life."  Tr. 183.  He acknowledged losing a job because he was "not able to take commands from an equal."  Tr. 184.  While alleging problems paying attention, Plaintiff stated that he could finish tasks started and could follow spoken and written instructions.  Tr. 183.  Plaintiff stated that stress made him feel depressed, so that he didn't want to leave home,

and he had trouble remembering things due to his sickness.  Tr. 184.  He wrote down all appointments and tried to take his medications at the same time every day.  Tr. 179.

At the administrative hearing held on July 13, 2011, Plaintiff's representative did not seek review of the seizure disorder as a listing level impairment, but indicated that the seizure disorder, in combination with his anxiety and depressive disorders, and the more recent right leg pain due to status-post gunshot wound to the right buttock, thigh and calf, made it impossible for Plaintiff to sustain any kind of gainful activity on a long-term basis.  Tr. 34-35.

Plaintiff testified that in June 2010, after a misunderstanding and argument with the nephew of a building neighbor over a bus pass, he was shot in the back.  Tr. 36.  Plaintiff had not been to physical therapy since being shot, although orthopedic and physical therapy were recommended by a Highland[2] doctor.  Tr. 36-37.

Regarding the alleged seizure disorder, Plaintiff testified that he took medication, Tegretol, three times a day and that he last had a seizure a week or two ago, because his "tongue was bitten up."  Tr. 38.  Plaintiff stated that he had not followed up with a neurology appointment at Highland because he changed to a doctor at Anthony Jordan Health Center and was awaiting a neurology appointment in the mail.  Tr. 38-39, 41-42.  Plaintiff testified that he had been hospitalized because of his seizures, but could not remember when because the seizure disorder caused him to have a bad memory.  Tr. 42.  According to Plaintiff, there were no witnesses to these seizures because he lived alone.  *Id.*  He did not have a driver's license and could not drive because of the seizure disorder.  Tr. 43.

Plaintiff testified that he had not worked for a paycheck, but worked around the house, or doing odd jobs, and could work for an hour or two, but would have to stop and sit down, because of the pain and when, possibly due to high blood pressure, his "head will get light."  Tr. 39-40.

---

[2] Plaintiff's testimony references "Highland," but the proper designation of the institution is the University of Rochester Medical Center's Highland Family Medicine ("Highland Family Medicine").

Additionally, every day, he went to the WEP program, but was limited to working a total of 16 hours per week. Tr. 40.

Plaintiff testified that he had a history of using drugs and alcohol, and last used drugs many years ago, but drank "three beers a day," even though doctors told him and he understood, alcohol would cause his seizure medication and the antidepressants he also was taking not to work. Tr. 42, 45-47. Plaintiff stated that he had tried many times to quit drinking alcohol and had been in programs to quit, but couldn't remember the last time. Tr. 43. He was attending NA meetings next door to the WEP program, but confidentiality was an issue there. *Id.* Plaintiff stated that even if he wasn't drinking alcohol, he could only work part-time, anyway. Tr. 43-44. He acknowledged telling psychologist Christine Ransom during an evaluation that he stopped working in February of 2010, but explained that as part of his sickness with his seizure disorder, his memory was really terrible. Tr. 45.

Testifying that he had received his GED when he was in jail, Plaintiff stated he couldn't remember when he was last in jail. Tr. 46-47. Plaintiff testified that he was in regular education in school. Tr. 46. He also had limited vision in his right eye, but did not have to wear glasses. Tr. 48.

In response to questioning by the ALJ, the VE testified regarding positions in the national economy that a hypothetical individual of claimant's age, education, and work experience, who had a high school education, no past relevant work, a medium or light exertional restriction, a limitation of simple, routine and repetitive tasks, limited vision in his right eye, but did not have to wear glasses, no limitation for any fine and gross motor activity, no climbing ladders, ropes, and scaffolds, and no heights and machinery, could perform. Tr. 47-49. The VE offered that the hypothetical individual could engage in four types of medium or light, unskilled jobs in the national economy: hospital cleaner (medium exertion), dietary aide (medium exertion), garment

sorter (light exertion), and housekeeper/cleaner (light exertion).  *Id.* at 48-49.  Respectively, in

the state economy and national economy, there were 5600/150,000 hospital cleaner jobs;

4400/186,000 dietary aide jobs; 1300/48,000 garment sorter jobs; and 20,000/800,000

housekeeping/cleaner jobs.  *Id.*

**C.  Medical Evidence**

Plaintiff was treated at University of Rochester Medical Center's Highland Family

Medicine Neurology Clinic ("Highland Neurology Clinic") from June 3, 2009 to July 6, 2010 for

his seizure disorder, and various, physical medical conditions.  Tr. 275-343; partially repeated at

Tr. 224-39.  At the visit on January 18, 2010, Plaintiff reported to Dr. Timothy Ashley a history

as follows: his first seizure occurred in 1988 or 1989 during a prison stay; with no acute trauma

at the time, was struck in the head with a baseball bat in 1985 or 1986; unable to describe the

first seizure, but indicated that he lost consciousness in prison intake and was witnessed by

prison staff to be shaking; seizures in the past at the wheel of a car  and has not driven since the

early 1990's; many episodes of generalized shaking witnessed by relatives, friends,

acquaintances, and medical personnel; cannot personally recall any of the seizures, but his wife

described them as "shaking all over;" and girlfriend described to him "generalized shaking" the

morning after she witnessed it at night; knowing he's had a seizure if upon awakening he's bitten

the inside of his jaw; infirm memory, but recollection of one time in jail when he had numerous

seizures resulting from receiving generic medication instead of the name brand Tegretol; and

past hospitalization for medication overdose, but never specifically for uncontrolled seizure.  Tr.

325.

The physical examination conducted on January 18, 2010 was otherwise normal, and the

observations of his mental status showed that Plaintiff had a Mini-Mental State Examination

("MMSE") score of 30; normal attention; no signs of neglect; fluent language; full orientation;

normal short term memory, but hazy for past events; and his intellectual fund of knowledge, judgment, mood and affect, thought content, all appeared normal.  Tr. 326.  Dr. Anthony Maroldo, M.D. noted that the only EEG available reports were from an acute hospitalization in 2004 which did not reveal any "epileptiform abnormalities," however, the results of a November 2006 non-contrast CT revealed "a slight asymmetry of the temporal horns of the lateral ventricles, with the right being larger than the right [sic], [] but "no clear ipsilateral mesial temporal atrophy."  Tr. 327.  There were no obvious structural abnormalities that would predispose him to seizures.  *Id.*  Plaintiff was agreeable with the medical regime discussed.  *Id.* The MMSE score suggested only mild cognitive impairment. Tr. 330.  Dr. Maroldo referred Plaintiff for an outpatient EEG to evaluate "inter-ietal epileptiform abnormalities."  Tr. 327.

When Plaintiff appeared at Highland Neurology Clinic for the EEG appointment on February 3, 2010, he reported a known seizure disorder since 1984, after being hit in the head with a bat; typically, with seizures two to three times a week.  Tr. 323.  The EEG study performed that day revealed an "abnormal EEG due to frontally predominant spike with after coming slow wave discharges primarily occurring over the left frontal region and rarely over the right frontal region in addition to some intermittent bi-frontal slowing with drowsiness," findings which reflected that Plaintiff had "ongoing bifrontal epileptogenicity which is more prominent over the left frontal region than the right as well as underlying neuronal dysfunction of the frontal regions bilaterally."  *Id.*

On May 4, 2010, Dr. Harbinder Toor, M.D. performed a consultative physical examination of Plaintiff.  Tr. 245-48.  Plaintiff's chief complaint was a history of hepatitis C, a seizure disorder since 1990, depression, and mental health issues.  Tr. 245.  He reported current medications as Tegretol, Lamotrigine and Lexapro, but denied having any recent seizures or pain during the exam.  *Id.*  Plaintiff reported drinking alcohol, but indicated that he quit using

marijuana and cocaine in 2007. *Id.* His reported activities of daily living included cooking five days a week, laundry once a month, cleaning every day, shopping twice a month, showering and bathing five days a week, dressing himself daily, watching TV, listening to the radio, going out to walk, to the store and socializing with friends and family. Tr. 245-246. Reading the Bible was his hobby. Tr. 246. Upon conducting a physical examination, Dr. Toor noted that Plaintiff was 5'11," weighed 166 pounds and appeared to be in no acute distress. *Id.* His vision was 20/20 in the right eye[3] and 20/25 in the left eye, with both eyes 20/25 on the Snellen chart at 20 feet. *Id.* Plaintiff had severely decreased vision in the right eye. *Id.* His gait was normal, and he could walk on his heels and toes without difficulty, squat fully, stand normally, and used no assistive devices. *Id.* Additionally, Plaintiff needed no help changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty. *Id.* His cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally, with no evidence of scoliosis, kyphosis or abnormality in the thoracic spine. Tr. 247. The lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. *Id.* Plaintiff had the full range of motion in his shoulders, elbows, forearms, and wrists bilaterally, and hips, knees, and ankles bilaterally. *Id.* His strength in upper and lower extremities was 5/5, with no evident subluxations, contractures, ankylosis, or thickening; his joints were stable and nontender, with no redness, heat, swelling, or effusion. *Id.*

Neurologically, Plaintiff had no motor or sensory deficit; his deep tendon reflexes were physiologic and equal in the upper and lower extremities. *Id.* His extremities showed no cyanosis, clubbing or edema, or significant varicosities or trophic changes, and his pulses physiologic and equal. *Id.* Plaintiff's hand and finger dexterity was intact and his grip strength was 5/5 bilaterally. *Id.* Dr. Toor opined that Plaintiff's prognosis was fair and assessed Plaintiff

---

[3] Dr. Toor also stated in the report, "Plaintiff has severely decreased vision in the right eye." Plaintiff testified during the hearing to having decreased vision in his right eye, and the ALJ utilized this vision assessment as an element of the hypothetical posed to the Vocational Expert. Tr. 47-48.

as having no limitation for any fine or gross motor activity, but stated that he should be careful at heights or operating machinery because of a history of seizures and should be careful about daily routines because of severely decreased vision in his right eye. Tr. 248. Dr. Toor further advised that Plaintiff could be evaluated by a psychologist or psychiatrist for depression, but noted that his evaluation suggested no other medical limitations. *Id.*

At the Commissioner's request, Christine Ransom, Ph.D., a licensed psychologist, conducted a consultative psychiatric evaluation of Plaintiff on May 4, 2010. Tr. 241-244. Plaintiff provided background information including that he lived alone and walked four miles to the evaluation; he had completed his GED and was in regular education in school; work during his lifetime consisted of janitorial work, shipping, receiving and general moving; he stopped work in February 2010 and was unable to find a another job. Tr. 241.

Dr. Ransom noted that Plaintiff never had to be hospitalized for a psychiatric problem, but he had received outpatient treatment at Genesee Mental Health in 2007 and current treatment for depression was provided by his primary care physician; he was also receiving medication for depression. Tr. 241. Plaintiff's medical history included hospitalization in 2008 at Strong Memorial Hospital for seizure and chronic conditions of disorder and hepatitis C. *Id.* Plaintiff's current daily medications were Tegretol, Lamotrigine, and Lexapro. *Id.* He had a history of abusing alcohol, but indicated that he stopped using marijuana and cocaine in 2007. Tr. 242.

During the mental status examination, Dr. Ransom observed that Plaintiff, who appeared to be his stated age, was cooperative and socially appropriate. Tr. 242. Plaintiff was neatly and appropriately dressed and groomed, with normal gait, posture, motor behavior, and appropriate eye contact. *Id.* Plaintiff's speech was fluent and intelligible, voice quality was clear, both expressive and receptive language skills were good, and his thought processes were coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia. *Id.* He expressed a full

range of affect appropriate to speech and thought content and his mood was neutral. *Id.* His sensorium was clear, and he was oriented to person, place, and time. Tr. 243. Plaintiff's attention and concentration, as evidenced by counting backwards from 20, doing simple calculations and serial threes without error, were intact. *Id.* Dr. Ransom also determined that Plaintiff's recent and remote memory was intact based on his recalling three out of three objects immediately and again, after five minutes; remembering five digits forward and three digits backwards; and recalling adequate detail about his own personal history. *Id.* Regarding Plaintiff's cognitive functioning, Dr. Ransom estimated that he was of average intellectual functioning, and his fund of information was appropriate to his experience; and his insight and judgment were good "as he cooperates with treatment as recommended." *Id.*

Regarding daily activities, Dr. Ransom determined that Plaintiff could dress, bathe, and groom himself; cook and prepare food; clean, do laundry, shop and manage his own money. *Id.* He socialized mainly with family and neighbors and spent time reading the Bible, watching television, listening to the radio, and reading. *Id.* Plaintiff also liked to take walks. *Id.* She noted that Plaintiff appeared capable of appropriately managing funds. Tr. 244. Consequently, Dr. Ransom opined that Plaintiff could follow and understand simple directions and instructions, independently perform simple tasks, maintain a simple regular schedule and learn simple new tasks; that he also could perform complex tasks, make appropriate decisions, adequately relate to others and appropriately deal with stress. Moreover, her evaluation results were consistent with Plaintiff's allegations. Tr. 243. Dr. Ransom's diagnosis reflected that Plaintiff suffered from "major depressive disorder, currently in remission," with mild residual episodic depression; alcohol, marijuana and cocaine dependence, currently in remission; and a seizure disorder and hepatitis C. Tr. 243-244. She recommended that Plaintiff continue his current treatment, noting that his prognosis was good. Tr. 244.

On May 13, 2010, non-examining medical consultant Z. Mata, M.D. assessed Plaintiff's RFC using the Psychiatric Review Technique form and found that Plaintiff had an affective disorder — a major depressive disorder that did not precisely satisfy the diagnostic criteria of 12.04.[4]   Tr. 249, 252.   He assessed mild restrictions of daily living; moderate difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace; and the absence of repeated episodes of deterioration of extended duration.   Tr. 259.   Dr. Mata noted Plaintiff's "major depressive disorder currently in remission."   Tr. 269.   Summarizing Plaintiff's limitations, Dr. Mata concluded that Plaintiff was moderately limited in the following areas: ability to work in coordination with or in proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.   Tr. 269-70.   In all other areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, Dr. Mata found no significant limitations.   *Id.*

On May 13, 2010, D. Valla conducted a physical RFC assessment and, using Plaintiff's age, education and history which included an alleged seizure disorder and Hepatitis C, preliminarily determined that Plaintiff had no exertional limitations; had postural limitations indicating that he could occasionally climb ladder/rope/scaffolds, but could frequently climb ramp/stairs, kneel, crouch, crawl; had no manipulative limitations; had limited depth perception

---

[4] The Psychiatric Review Technique used by Dr. Mata, as documentation of factors that evidence an affective disorder, required "Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: Depressive syndrome characterized by at least four of [nine listed symptoms]; Manic syndrome characterized by at least three of  [eight listed symptoms]; Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)."

due to severely restricted vision in his right eye; no communicative or environmental limitations. Tr. 263-266. D. Valla found that Plaintiff had "an MDI" to which his credible symptoms were attributable, but without limitations in functioning as a result. Tr. 267. This evaluator indicated that treating/examining source conclusions in the reviewed file were not significantly different from his findings. *Id.*

On June 19, 2010, Plaintiff presented at the emergency room after sustaining multiple gunshot wounds to the left buttock/hip and right knee; also, at that time, he underwent an evaluative EEG to determine "epileptiform abnormalities." Tr. 289. The abnormal EEG showed an "underlying, moderate, diffuse, and nonspecific encephalopathy," which in the opinion of the administering physician, might be related, in part, to medications. *Id.* There were "no epileptiform abnormalities," however. *Id.*

On July 6, 2010, Plaintiff visited Highland Family Medicine and was seen by Dr. Stephen Lurie for completion of disability paperwork for DSS after being shot in the back of his right knee and left buttock. Tr. 275. Plaintiff stated that he was going to call the office back when he was ready to make an appointment with Neurology. *Id.*

On August 31, 2010, Deborah Pierce, M.D., treating primary care physician, saw Plaintiff at Highland Family Medicine for a check of his right foot; right knee pain post-gunshot wound; pain traveling down his lower leg to foot and shooting pain down the back of his calf, and numbness on the bottom of his foot. Tr. 440. He also complained that the walking boot he was using was broken, resulting in uncontrolled pain. *Id.* Dr. Pierce determined that lower right leg pain indicated that Plaintiff most likely had "neuropathic pain secondary to his right knee gunshot wound along with a finding of foot drop and plantar numbness"; she "appreciated" no joint problems in his ankle or knee. *Id.* Plaintiff had not yet seen a physical therapist ("PT") following discharge from the hospital. *Id.* According to her treatment notes, Dr. Pierce

discussed with Plaintiff a treatment plan that included starting PT, seeing "Ortho," starting Gabapentin for neuropathic pain, but Plaintiff became increasingly frustrated because his previous medical plans were not carried out. *Id.* He wanted Percocet which he said was the only thing that helped his pain and was frustrated that Dr. Pierce would only try Gabapentin. *Id.* Plaintiff did not want a new PT because the home PT never showed up, and was very upset that his broken boot could not be taken care of then. *Id.* Plaintiff was very angry, stating that he did not want to deal with them anymore, and agreed that the best plan would be the provision of a selection of other primary care providers. Tr. 440-41. After receiving a list of other providers, Plaintiff indicated that he did not want to follow through with any proposed treatment plans, and left. Tr. 441.

The treatment notes of Laura Carpenter, N.P. from November 23, 2010 show that Plaintiff did visit Highland Family Medicine because he needed DSS forms completed and to follow up on medical concerns. Tr. 438. Plaintiff reported that he was taking medication daily as prescribed for his seizure disorder, but denied any recent seizures, stating that he had not seen neurology since hospitalization in June; he was continuing to take Lexapro daily for depression; he had been trying to connect with mental health services at Genesee Mental Health Center ("GMHC"), but got frustrated at the long telephone wait and hung up, and had been unable to coordinate visits with his counselor; he was not currently taking anything for relief of pain in his right leg, or the constant pain and achiness, with sharp bursts of pain from popliteal area radiating down leg to foot; and he had intermittent foot swelling and pain from walking or standing more than 20-30 minutes. *Id.* Although the assessment showed chronic pain likely due to nerve damage, Plaintiff declined PT, and "Neurontin/TCA" use for pain, but was prescribed Ibuprofen for comfort and referred to pain clinic for consultation/management. Tr. 439. Lastly,

per these notes, Plaintiff's DSS forms were completed, copied and faxed to the DSS office, and Ms. Carpenter noted that Plaintiff "Agrees to 16 hours a week training/work program." *Id.*

On January 27, 2011, Plaintiff visited GMHC on a referral by the Mobile Crisis Team for treatment of depression; the Pre-Admission Screen showed that he had been treated at GMHC before, and had requested the Mobile Crisis Team evaluation "in order to help him link with services." Tr. 371.  Plaintiff, stating that over the last two years he had an increase in stressors which led to increases in his symptoms of depression and some anxiety, was appropriately dressed and groomed, with cooperative behavior, spontaneous and clear speech, goal-directed and organized thoughts, oriented times three, intact recent memory, remote memory slightly impaired, depressed mood, flat affect congruent with mood, fair insight and judgment, fair to good impulse control and fair to good concentration.  Tr. 371-72.  He reported upsetting and difficult familial relationships, a seizure disorder, pain due to being shot in the leg and buttocks in June 2010, feeling sad and blue, isolating himself at home, drinking about three beers twice a week, but last used cocaine a couple of years ago.  Tr. 371-372.  The initial diagnosis included: Rule Out Anxiety Disorder NOS; Rule Out Depressive Disorder NOS; Rule Out Alcohol Abuse; Cocaine Dependence in Sustained Full Remission; Seizure Disorder; pain in back, leg, and foot due to being shot; Level of stressors: #3 — limited resources and support, medical, unemployed; and a current GAF of 53.[5]  Tr. 373.  The initial treatment plan indicated the need for ongoing treatment with primary therapist Randy Smart, based upon Plaintiff's reported symptoms of depression and anxiety.  *Id.*

---

[5]Per n.3 of Defense Mem., ECF No. 10:

> "A patient's GAF score indicates her overall psychological functioning.  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text revision 2000).*  A GAF of 51 - 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning *(e.g.*, few friends, conflicts with peers or co-workers).

In a Psychosocial Assessment Admission Note written on February 16, 2011 by Randy Smart, Licensed Marriage and Family Therapist ("LMFT Smart") at GMHC, Plaintiff reported an escalation of depressive symptoms over the last two years. LMFT Smart described the presenting problem in the following manner:

> Client remains fixated throughout session on relationships with family stating that many of his family do not understand him and look down upon him due to a history of legal problems and substance dependence. This appears to be upsetting for client to deal with. Client reports having somebody to talk with him and provide positive feedback is very important to him. He reports multiple losses over the last three years. He reports the death of his mother in 1997 when he was incarcerated, very upsetting as he was very close with her throughout her life. He also reports the death of his dad and brother, both again while he was incarcerated. They happened two years apart. The first occurring five to six years ago. Client was unable to give specific dates. Client reports that due to his stressors, he is experiencing symptoms of depression. Client reports additional stressor in that he was shot in the leg and buttocks in June of 2010. He continues to have some difficulty with mobility and ongoing pain as a result. He reports feeling sad and blue, isolating himself, having little energy and motivation to get out and do things such as cooking meals or leaving the home. He also reports changes in doing things that he usually enjoys doing such as exercising. Client also reports some anxiety including feelings of nervousness and feeling uncomfortable. Client states that he has been isolating himself and keeping himself in the house as he has a history of aggressive and assaultive behaviors towards others and does not want to harm anybody and therefore has been keeping to himself. Client states that his goal of treatment would be to have better relationship with others in his life as well as to learn to better cope with symptoms and stressors. He also notes that he may have some grief and loss issues around the death of his mother that he would like to work on as well. Client reports that he is interested in reengaging in therapy. He feels it had been helpful to him in the past and that he would like to be able to process somethings. Client is also interested in meeting the psychiatrist to discuss whether or not his antidepressants are really working and to see if there might not be a better option out there for him in terms of medications.

Tr. 365.

LMFT Smart took note that Plaintiff denied any mental health treatment since last seen at GMHC in 2008. Tr. 366. A mental status exam showed that Plaintiff was appropriately dressed and groomed, with cooperative behavior, spontaneous and clear speech, goal-directed and organized thoughts, oriented times three, intact recent memory, remote memory slightly

impaired, depressed mood, flat affect congruent with mood, fair insight and judgment, fair to good impulse control and fair to good concentration. Tr. 367. LMFT Smart also performed a lethality assessment and determined that Plaintiff was safe to remain in the community because he was agreeable with a safety plan of calling 911 or lifeline, should he begin to feel as though he may act on thoughts of harming himself or others. *Id.*

LMFT Smart also assessed Plaintiff's medical history which included seizure disorder and the medications he was taking, Tegretol and Lexapro, the injuries and pain due to being shot in the leg and buttocks. Tr. 366-67. Assessing Plaintiff's substance abuse history, which included Plaintiff's report that he last used cocaine a "couple of years ago," last used marijuana about 10 months ago, last used alcohol on January 21, 2011, and drinks three beers twice a week, as well as his reports of past inpatient treatment, and his denial of negative consequences at this time regarding his substance abuse, LMFT Smart stated, "[f]urther assessment around his substance abuse is necessary as well as necessary referral to chemical dependency treatment." Tr. 366.

LMFT Smart described Plaintiff's prognosis as "fair." Tr. 368. His DSM-IV diagnosis included: Rule Out Anxiety Disorder NOS; Rule Out Depressive Disorder NOS; Rule Out Alcohol Abuse; Cocaine Dependence in Sustained Full Remission; Axis II Diagnosis Deferred; Seizure Disorder; pain in back, leg, and foot due to being shot; Level of stressors: #3 − limited resources and support, medical, unemployed; and a current GAF of 53. *Id.*

LMFT Smart wrote that the Comprehensive Treatment Plan was to be implemented before March 15, 2011. Additional treatment notes in the record reflect that Plaintiff received mental health therapy at GMHC through May 5, 2011. Tr. 345-375.

On May 6, 2011, Plaintiff went to the emergency room at Strong Memorial Hospital ("SMH"), reporting a seizure that occurred one hour before presenting there, during which he fell

on his face, broke his nose, knocked out one of his teeth and sustained a lip laceration.  Tr. 388.
Plaintiff stated that he knew he had a seizure because afterwards he "is unable to walk gets very
'stumbly, as if I am drunk.'"  Tr. 391.  Plaintiff displayed no confusion, speech difficulty, or
visual disturbance, and had no chest pain.  Tr. 388.  The head CT scan showed no acute
intracranial abnormalities.  Tr. 393-401.  Treating physicians Joel L. May and Michael Kamall
instructed Plaintiff to follow up with his doctor about changing his anti-depressant medication,
because "it may decrease his threshold for having a seizure"; to decrease the Tegretol level in the
evening because it was "too high"; and to follow up in the neurology clinic.  Tr. 392.

Plaintiff presented to the emergency room at SMH again on May 18, 2011, and was
diagnosed with alcohol intoxication.  Tr. 407-408.  He reported an "inability to recall" events for
a short period of time after drinking.  Tr. 408.

On May 31, 2011, June 7, 2011, and July 7, 2011, Samuel Rosati, M.D., of the Anthony
Jordan Health Center, treated Plaintiff for a seizure disorder and chronic pain due to a gunshot
wound.  Tr. 449-456.  Plaintiff was in no acute distress; had a normal range of motion in his
extremities; had normal gait; was alert and oriented times three; denied having pain in the last
week; and had appropriate mood affect.  *Id.*  On June 7, 2011, Dr. Rosati noted that Plaintiff had
"mild anxiety controlled on Lexapro and needs a higher dose.  Admits to not taking Tegretol as
[prescribed] at times."  Tr. 452.

On July 7, 2011, LMFT Smart completed a Mental Residual Functional Capacity
Questionnaire.  Tr. 444-48.  He listed on average, biweekly contacts with Plaintiff since February
2011, and previously from January 2007 to January 2008.  Tr. 444.  He assessed Plaintiff as
having anxiety disorder, depressive disorder, a seizure disorder, and back pain, with a current
GAF of 53 and past GAF of 57.  *Id.*  LMFT Smart noted that Plaintiff had scheduled individual
therapy and an appointment with a psychiatrist for a medical evaluation on July 18, 2011, stating

further that no medications had yet been prescribed at GMHC and, thus, no observations of side effects with implications for working. *Id.* His clinical findings included that for the past several years Plaintiff had suffered from depressive and anxious symptoms that impair his ability to interact effectively with others; his prognosis was fair with ongoing treatment. *Id.* LMFT Smart identified the following signs and symptoms: decreased energy; mood disturbances; recurrent and intrusive recollections of a traumatic experience, a source of marked distress; apprehensive expectation; intense and interpersonal relationships and impulsive and damaging behavior; and sleep disturbance. Tr. 445.

Evaluating 16 mental abilities and aptitudes needed to do unskilled work, LMFT Smart listed six as "seriously limited": maintain attention for two hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and deal with work stress. Tr. 446. Plaintiff's abilities in the remaining 10 areas were "limited but satisfactory." *Id.* According to LMFT Smart, Plaintiff's anxiety affected his ability to focus and consistently work without the need for support, breaks, etc. *Id.* Regarding semiskilled and skilled work abilities and aptitudes, LMFT Smart stated that Plaintiff had "limited but satisfactory" ability to understand and remember detailed instructions, to carry out detailed instructions and to set realistic goals or make plans independently of others, but his ability to deal with the stress of such work was "seriously limited" because his symptoms caused "some difficulty" dealing with stress appropriately. Tr. 447. Although LMFT Smart stated, regarding the ability to do particular types of jobs, that Plaintiff was "seriously limited" in his ability to maintain socially appropriate behavior and travel in unfamiliar places because he often loses his temper and is

hesitant to go to unknown, unfamiliar places due to traumatic history, nevertheless, Plaintiff did have "limited but satisfactory" ability to interact appropriately with the general public, to adhere to basic standards of neatness and cleanliness and use public transportation. *Id.*

LMFT Smart indicated that Plaintiff did not have a low IQ or reduced intellectual functioning; that Plaintiff's psychiatric condition "possibly" exacerbated his experiencing pain or other physical symptom; that Plaintiff's impairments or treatment would cause him to be absent from work "about four days per month"; and that Plaintiff was not a malingerer, but his impairments, which were reasonably consistent with described symptoms and functional limitations, could be expected to last at least 12 months. Tr. 447-48. Neither alcohol nor substance abuse contributed to any of the aforementioned limitations, and Plaintiff could manage benefits in his own best interest, LMFT Smart stated. Tr. 448. In LMFT Smart's opinion, Plaintiff could not engage in full-time competitive employment on a sustained basis. *Id.*

## III.   DISCUSSION

### A.  Scope of Review

On appeal, this Court's role is to determine "if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see also* Title 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."). It is not this Court's function to "determine *de novo* whether the [plaintiff] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (citation omitted). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Burgess v. Astrue*, 537 F.3d 117, 127-

128 (2d Cir. 2008) (citing *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### B.  Fed. R. Civ. P. 12(c) Standard

Rule 12(c) permits a party to move for judgment on the pleadings "after the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c).  Thus, in deciding a Rule 12(c) motion, a court employs the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6).  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam).  A court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Id.*  To withstand a motion for judgment on the pleadings, a court must determine whether the "'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"  *Id.* at 161 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).  Thus, granting judgment on the pleadings is only appropriate when, after reviewing the record, the court is convinced that the plaintiff has failed to set forth a plausible claim for the requested relief based on the evidence presented. *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### C.  Standard for Eligibility for SSI

The SSA provides that an individual shall be considered disabled if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  An individual will be determined to be disabled only upon a demonstration that his or her physical impairment(s) are of such severity as to preclude him or her from not only performing his or her previous work but, considering his or her age, education, and work

experience, from engaging in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

In determining whether an individual is disabled, using this definition, the Commissioner must engage in the SSA-created five-step sequential evaluation process outlined in 20 C.F.R. § 416.920.  The Commissioner must consider, in order: (1) the individual's work activity (20 C.F.R. § 416.920(a)(4)(i)); (2) the medical severity of the impairment(s) and that it meets the duration requirement in § 416.909 (20 C.F.R. § 416.920(a)(4)(ii)); (3) the medical severity of the impairment(s) and that it meets or equals the listings criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(a)(4)(iii)); (4) an assessment of the individual's residual functional capacity and past relevant work history (20 C.F.R. § 416.920(a)(4)(iv)); and (5) an assessment of the individual's residual functional capacity and age, education, and work experience to see whether he or she can make an adjustment to any other type of work (20 C.F.R. § 416.920(a)(4)(v)).

The required analysis is as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work.  Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).  The claimant bears the general burden of proving that he or she has a disability at steps one through four of the sequential five-step

process, *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), and only when the claimant proves

that he or she cannot return to his or her prior work, at step five, does the burden shift to the

Commissioner to prove the existence of alternative substantial gainful work in significant

numbers in the national economy which claimant can perform, considering his or her physical

and mental capabilities, age, education, experience and training. *Berry v. Schweiker*, 675 F.2d

464, 467 (2d Cir. 1982).

### D. The ALJ's Decision

The ALJ followed the sequential five-step analysis for evaluating Plaintiff's claim of

disability. Tr. 14-24. At step one, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since March 1, 2010, the application date (20 C.F.R. 416.971 *et seq*). Tr. 14. At

step two, he found that Plaintiff had the following severe impairments: seizure disorder, status-

post gunshot wounds in the right buttocks, right thigh, and right calf, right foot drop, ongoing

alcohol abuse, cocaine and cannabis abuse in sustained remission, and depression. 20 C.F.R. §

416.920(c). *Id.* At step three, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that meets or medically equals the severity of the listed impairments

in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

*Id.* The ALJ, after careful consideration of the record consisting of the medical evidence, other

evidence and Plaintiff's subjective complaints, at step four, concluded that Plaintiff had the

residual functional capacity to perform light work[6] with limitations, including, only simple

routine, repetitive tasks; no scaffolds/ropes/ladders and heights and heavy machinery; and

---

[6] As defined in 20 C.F.R. § 416.967(b),

> light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking, standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

limited vision in the right eye. Tr. 15. Also, at step four, the ALJ found that Plaintiff had no past relevant work. *Id.* Considering Plaintiff's age, education, work experience, and residual functional capacity, at step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform; specifically, housekeeper/cleaner, and garment sorter. Tr. 23. Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined in the SSA, since March 1, 2010, the date the application was filed (20 CFR 416.920(g)). Based on the application for supplemental security income protectively filed on March 1, 2010, she concluded that Plaintiff was not disabled under § 1614(a)(3)(A) of the SSA. Tr. 23-24.

### E.  The Commissioner Applied the Correct Legal Standards

Upon review and as discussed herein below, there is nothing to support any contention that the Commissioner failed to apply the correct legal standard. First, there is no doubt that the Commissioner applied the correct legal standards by engaging in the SSA-created five-step sequential evaluation process outlined in 20 C.F.R. § 416.920. Second, the Commissioner utilized the proper legal standard in weighing the opinions of her treating physicians.

### F.  Substantial Evidence Supported the Commissioner's Decision

I find that the ALJ based his decision that the Plaintiff was not disabled upon a record which contained substantial evidence to support the decision. The ALJ clearly reviewed and considered all available evidence in reaching his decision. In so doing, at step one he found that Plaintiff had not engaged in substantial gainful activity since March 1, 2010, the application date (20 C.F.R. 416.971 *et seq*). Tr. 14. At step two, he found that Plaintiff had the following severe impairments: seizure disorder, status-post gunshot wounds in the right buttocks, right thigh, and right calf, right foot drop, ongoing alcohol abuse, cocaine and cannabis abuse in sustained

remission, and depression.  20 C.F.R.  § 416.920(c).  *Id.*  These impairments, according to the ALJ, caused more than minimal limitation in the Plaintiff's ability to perform basic work activities.  *Id.*

In determining at step three that Plaintiff's severe mental impairments, singly or in combination, did not meet or medically equal the criteria of listing 12.04, 12.06, and 12.09, the ALJ evaluated them according to the criteria set forth in "paragraphs B and C." Tr. 14.  As the ALJ stated, "paragraph B" required that the mental impairment must result in two of the following: marked restriction of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  The ALJ noted that "marked limitation" means "more than moderate but less than extreme," and "repeated episodes of decompensation, each of extended duration" means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.*  The ALJ described the criteria in "paragraph C" as requiring the following:

> repeated episodes of decompensation of extended duration; a residual disease process that has results in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; or the claimant's inability to function outside a highly supportive living arrangement.

Using these criteria to evaluate the record regarding Plaintiff's mental impairments, the ALJ considered that Plaintiff had mild restriction in daily living activities and moderate difficulties in social functioning, concentration, persistence or pace.  Tr. 14-15.  She concluded that the criteria in "paragraph B" had not been satisfied because the medical evidence reflected no episodes of decompensation which had been of extended duration.  Tr. 14.  She also determined that the criteria under "paragraph C," had not been satisfied either because the evidence failed to establish repeated episodes of decompensation of extended duration; or a residual disease process that resulted in such marginal adjustment that even a minimal increase in

24

mental demands or change in environment would be predicted to cause Plaintiff to decompensate; or the claimant's inability to function outside a highly supportive living arrangement. Tr. 15.

The ALJ, next, undertook a Residual Functional Capacity ("RFC") assessment pursuant to SSR 96-8p, which reflected the degree of limitation found in the "paragraph B" mental function analysis, taking care to note that the limitations identified in "paragraph B" were used to rate the severity of Plaintiff's mental impairments at steps. *Id.* Analyzing the entire record, the ALJ determined that Plaintiff had an RFC to perform light work, but with the following limitations: only simple routine, repetitive tasks; no scaffolds/ropes/ladders and heights and heavy machinery; limited vision in the right eye. *Id.*

In making this RFC determination, the ALJ considered all of Plaintiff's symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical and other evidence, based on the requirements of 20 C.F.R. 416.929 and SSRs 96-4p and 96-7p. *Id.* He also considered the opinion evidence in accordance with the requirements of 20 C.F.R. 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. *Id.*

The ALJ, first, reviewed Plaintiff's petition for benefits which alleged an inability to work due to seizure disorder and depression as of December 31, 2009 and found that, based upon his earnings record, Plaintiff had not engaged in substantial gainful activity even before his alleged onset date. Tr. 16. Observing that at the hearing, Plaintiff alleged disability based on a combination of impairments, including, his seizure disorder, anxiety disorder, depression, and gunshot wounds to his right buttock, posterior thigh and calf on June 19, 2010, some six months after the alleged onset date, the ALJ found that any resulting functional limitations would not be applicable until June 2010. *Id.* The ALJ further noted that Plaintiff's representative clarified at the hearing that Plaintiff was not alleging a listing-level seizure disorder, explaining that "the

nature of his seizure disorder makes it difficult for us to provide a timeline over any sustained time." According to the ALJ, the medical evidence, in addition to Plaintiff's testimony regarding bad memory as "one of the aspects of [his] seizure disorder," established that no one, including Plaintiff, knew exactly how many seizures he had and his poor memory did not lend to remembering when and how the seizures occurred. *Id.* The ALJ found Plaintiff's testimony that he knew he had weekly seizures because "At least once a week [his] jaw is bitten up or my tongue," to be consistent with the medical evidence, *e.g.*, a report on July 7, 2011 to his primary care physician Samuel Rosati, M.D. that he couldn't recall his last seizure, but guessed it occurred two weeks ago. *Id.*

For these reasons, the ALJ found that the medical evidence demonstrated a severe seizure disorder, but did not establish that the seizure disorder, alone or in combination with Plaintiff's other impairments, was disabling. *Id.* Arriving at this finding, the ALJ assigned the greatest weight to the neurology records. *Id.* He reviewed the medical records of Plaintiff's visits to Highland Neurology Clinic on January 18, 2010 and February 3, 2010; the June 19, 2010 EEG taken on the day Plaintiff was shot in the right buttock and thigh; the May 6, 2011 visit to SMH for a reported seizure an hour before presenting at the emergency room; and the May 18, 2011 return to the emergency room for diagnosed "alcohol intoxication," and reported memory problems after drinking. Tr. 16-17.

The ALJ pointed to specific medical history, observations, treatment, and laboratory results obtained on these visits. At the January 18, 2010 visit, Plaintiff attributed his seizure disorder to being hit with a bat in the 1980's, and reported a history to Timothy Ashley, M.D. as follows: his first seizure occurred in 1988 or 1989 during a prison stay; Plaintiff couldn't describe this first seizure except to say he lost consciousness while in prison intake and was witnessed by prison staff to be shaking; he had seizures at the wheel of a car in the past, has not

26

driven since the 1990's; he has had many episodes of generalized shaking witnessed by relatives, friends, acquaintances, and medical personnel; and once while in jail, and receiving generic medicine instead of name brand Tegretol, the generic medication led to numerous seizures. Tr. 16-17, 325. On February 3, 2010, the next visit, Plaintiff reported 2-3 seizures per week, and an EEG study conducted that day was abnormal, revealing "frontally predominant spike with after coming slow wave discharges primarily occurring over the left frontal region and rarely over the right frontal region in addition to some intermittent bi-frontal slowing with drowsiness," findings which reflected that Plaintiff had "ongoing bifrontal epileptogenicity which is more prominent over the left frontal region than the right as well as underlying neuronal dysfunction of the frontal regions bilaterally." Tr. 17, 323. The EEG performed on June 19, 2010 to evaluate epileptiform abnormalities was abnormal, reflecting "underlying, moderate, diffuse, and nonspecific encephalopathy," which the administering physician opined, "might be related to medications." Tr. 17, 289. When Plaintiff presented to SMH on May 6, 2011, he reported a seizure occurring one hour before coming to the emergency room, during which he fell on his face, knocked out one of his front teeth, broke his nose, and sustained a lip laceration. Tr. 17, 388. Plaintiff stated at that time that he knew he had a seizure because afterwards, he has headaches and "is unable to walk [and] gets very 'stumbly, as if I am drunk.'" Tr. 17, 391. Plaintiff displayed no confusion, speech difficulty, or visual disturbance, and had no chest pain. Tr. 17, 388. The head CT scan was normal. Tr. 17, 393-401. The treating physician instructed Plaintiff to decrease the Tegretol level because it was "too high"; to follow up in the neurology clinic; and opined that the anti-depressants may have decreased his "threshold for having a seizure." Tr. 17, 392. Plaintiff returned to the SMH emergency room on May 18, 2011 for diagnosed "alcohol intoxication," and reported memory problems after drinking. Tr. 16-17, 407-408.

The ALJ found that this medical evidence showed that Plaintiff had not followed up with neurology since February 3, 2010, and these two neurology appointments were insufficient to properly diagnose or treat his longstanding seizure disorder.  He also considered Plaintiff's hearing testimony that (1) he took Tegretol for his seizure disorder three times a day; (2) he had not been seen by a neurologist and recently changed his primary care physician; and (3) the new physician set up a neurology appointment, and the date was being mailed to him.  Tr. 17. Consequently, the ALJ found that this medical evidence, the remainder of the record, and Plaintiff's testimony simply established the existence of an uncontrolled seizure disorder, but not a disabling one.  Tr. 17.

The ALJ also considered Plaintiff's alleged physical impairments, finding that prior to the shooting on June 19, 2010, Plaintiff was able to walk four miles to the psychiatric consultative examination conducted on May 4, 2010, but testified at the hearing about the argument which led to the shooting, the resulting multiple gunshot wounds to his right buttock and thigh, and residual pain and loss of function.  Tr. 18.  He reviewed Plaintiff's reports, at a visit to his primary care physician on August 31, 2010, of pain in his right knee that traveled down his lower leg into his foot and that the pain was uncontrolled without the walking boot used since release from the hospital but which had fallen apart a week prior.  Tr. 18, 440. Treating primary care physician Dr. Pierce determined that lower right leg pain indicated that Plaintiff most likely had "neuropathic pain secondary to his right knee gunshot wound along with a finding of foot drop and plantar numbness"; she found no joint problems in his ankles or knees. *Id.*

After carefully noting Dr. Pierce's discussion with Plaintiff concerning a plan of care which included starting physical therapy, seeing orthopedics and starting Gabapentin for his neuropathic pain, the ALJ outlined from Dr. Pierce's treatment notes, Plaintiff's response:

28

increased frustration because the previous medical plans were not carried out; he wanted Percocet not Gabapentin; the home-based physical therapist never showed up; and also his anger that his broken walking boot could not be taken care of today in the clinic. *Id.* Dr. Pierce further noted that Plaintiff "was very angry and finally said that he did not want to deal with us anymore." *Id.*

On November 23, 2010, Plaintiff returned to the Highland Family Medicine Center, with continuing reports of constant pain, achiness with bursts of sharp pain form the popliteal area radiating down leg to his foot; swelling in his right foot and pain with prolonged standing and walking (more than 20-30 minutes). Tr. 18, 438.

The ALJ found that these two treatment notes, constituting the only medical evidence discussing the residual effects of Plaintiff's multiple gunshot wounds, demonstrated only that Plaintiff's injuries were uncontrolled, as opposed to disabling, based on the following: at the time of his complaints, Plaintiff was not taking any pain medication; he refused physical therapy; he refused Neurontin, even though his primary care physician suspected nerve damage; Plaintiff was prescribed Ibuprofen and referred to the pain clinic, but the medical evidence disclosed no pain clinic records. Tr. 18, 438-441. She further determined that while the medical evidence and Plaintiff's hearing testimony established a severe impairment in Plaintiff's buttock and right lower extremity, they did not establish a disabling physical impairment. Tr. 18-19.

The ALJ also took into account Plaintiff's testimony regarding his work activities, including, that he had not worked for money, but worked "around the house," or doing "odd jobs;" he could work for an hour or two, but would have to stop because of the pain or when he got heated up, and possibly due to high blood pressure, his "head will get light"; and every day, he went to the WEP program, as a requirement of public assistance, but was limited to working a

total of 16 hours per week, not the normal 40 hours per week, due to an assessment of disability from his doctor. Tr. 19, 39-40.

Plaintiff's substance abuse disorders were also considered in the ALJ's disability decision. Specifically, she considered Plaintiff's testimony that he no longer abused illegal drugs, but drinks "three beers a day," even though doctors advised him to stop drinking. Tr. 19, 42, 45-47. Plaintiff stated that he had tried many times to quit drinking alcohol and had participated in a rehabilitation program; and he was attending Narcotics Anonymous meetings, but confidentiality was an issue there, so he no longer participated. Tr. 19, 43. The ALJ determined that the medical evidence substantiated Plaintiff's ongoing alcohol abuse, referring most particularly to the May 18, 2011, emergency room diagnosis of "alcohol intoxication" when Plaintiff presented reporting memory problems after drinking. Tr. 19. Moreover, the ALJ considered medical evidence demonstrating that Plaintiff's cocaine and marijuana abuse were in sustained remission, finding significant Plaintiff's report that he last used cocaine a "couple of years ago" and last used marijuana 10 weeks prior to the February 16, 2011 mental assessment.[7] Tr. 19, 366, 372.

Regarding the claimed depression, the ALJ referenced Plaintiff's hearing testimony that he took antidepressants, but they didn't work, as well as his acknowledgment that alcohol use might interfere with the effectiveness of his medications. Tr. 19. Rather than demonstrating that Plaintiff was receiving mental health treatment throughout the relevant period, the ALJ found that the primary mental health treatment records dated November 23, 2010 clearly showed that Plaintiff was "disconnected" from mental health services, "was lost to treatment" because of frustration with long telephone waits and would hung up, and was not able to coordinate visits with [his] counselor. Tr. 19, 438-439.

---

[7] Exhibit 8F, upon which the ALJ relied, indicated a report of marijuana last used "10 months ago." Tr. 372. This misstatement on the part of the ALJ does not change or alter the assessment of "marijuana abuse in sustained remission."

The ALJ next turned his attention to mental health records demonstrating that on February 16, 2011, Plaintiff returned to GMHC for treatment, and in an assessment conducted by LMFT Smart, reported an escalation of depression over the last two years. Tr. 19-20, 365-368. Combing through the assessment, the ALJ considered the following evaluative statements related to Plaintiff's reports: (1) he was fixated on his family relationships, "stating that many of his family do not understand him and look down upon him due to a history of legal problems and substance abuse"; (2) he found his family's disapproval "upsetting" and "difficult to deal with"; (3) it was important for him to have somebody to talk to who could provide him with positive feedback; (4) he expressed guilt related to the death of his father and brother during his incarceration; (5) he attributed his depression to his family problems and health stemming from his June 2010 gunshot wound; (6) he reported mobility problems, ongoing pain, "feeling sad and blue," anxiety, uncomfortable and nervous feelings, social isolation, low energy and motivation to leave his home or cook; (7) he remained home and isolated himself from others because of his history of aggression and assaultive behaviors; (8) he stayed to himself to avoid hurting others; (9) he identified treatment goals of improving interpersonal relationships, better coping with symptoms and stressors, and dealing with bereavement issues; (10) he stated, "I would like to get my life under control." Tr. 20, 365. Pointing to the resultant diagnosis, the ALJ found that, despite Plaintiff's discussion of ongoing alcohol abuse, LMFT Smart ruled out anxiety disorder, depression, and alcohol abuse, assessed "cocaine dependence in sustained full remission," Axis II diagnosis was deferred and assessed GAF at 53. Tr. 20, 368.

To the ALJ, LMFT Smart's assessment that Plaintiff was not depressed, abusing alcohol, or suffering from anxiety disorder, was similar to the conclusions of psychiatric consultative examiner Christine Ransom, Ph.D. that Plaintiff's "major depression and polysubstance [dependence] were in remission, and he suffered from "mild residual episodic depression."

These conclusions formed the basis of Dr. Ransom's opinion that Plaintiff was capable of following and understanding simple instructions; independently performing simple tasks; maintaining attention and concentration for simple tasks; maintaining a simple regular schedule; learning simple new tasks; performing complex tasks; making appropriate decisions; adequately relating to others; and appropriately deal with stress.  Tr. 20, 243.  The ALJ stated that, in contrast, LMFT Smart, on July 7, 2011, offered a professional opinion that Plaintiff was incapable of competitive employment.  Tr. 20, 444-48.

The ALJ assigned greatest weight to the professional opinion of Dr. Ransom and very little weight to LMFT Smart's professional opinion that Plaintiff was incapable of working altogether, not simply because, unlike Dr. Ransom, he was not a medical doctor, but more importantly, because his opinion was inconsistent with the other medical evidence in the record, such as his own diagnosis on February 16, 2011 that did not include one severe mental impairment and ruled out anxiety disorder, depression and alcohol abuse.  Tr. 20-22, 368, 444-48.  Accordingly, the ALJ found significant the contrast between LMFT Smart's diagnosis of February 16, 2011 with his Mental RFC assessment on July 7, 2011, wherein he stated that (1) Plaintiff "suffered from depressive and anxious symptoms that [impaired] his ability to interact effectively with others for the past few years," and identified as related symptoms: "decreased energy, mood disturbance, recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress, apprehensive expectation, intense and unstable interpersonal relationships and impulsive and damaging behavior, and sleep disturbance; (2) Plaintiff was "seriously limited" in his ability to maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent

pace without an unreasonable number and length of rest periods; and deal with work stress; maintaining socially appropriate behavior; and traveling in unfamiliar places; (3) Plaintiff's "anxiety affects his ability to focus and consistently work without the need for support, breaks, etc.; he "has more difficulty because of his symptoms dealing with stress appropriately" and "often loses his temper, is hesitant to go to unfamiliar settings due to his trauma history." Tr. 21, 444-45, 446. The ALJ took note that LMFT Smart did not find that Plaintiff had "no useful function," or was "unable to meet competitive standards," or had any reduced intellectual functioning," although he did estimate that he would be absent from work approximately four days per month. Tr. 21, 444-48.

The ALJ found that Plaintiff's statements that he could only work part-time were substantiated by medical evidence in the record, including statements made by his primary care provider when completing the DSS forms on November 23, 2010, and the assessment of Plaintiff's limitations, including working 16 hours per week, effective December 22, 2010, by a "licensed physician and other medical professional" affiliated with the Monroe County Department of Human Services. Tr. 22, 43-44; 160, 439. Consequently, the ALJ found, after assigning greatest weight to the treating records discussing Plaintiff's seizure disorder and gunshot wounds, from Highland Neurology Clinic and Highland Family Medicine Center, found that Plaintiff's physical impairments were fully accommodated by the articulate RFC. Tr. 22. Assigning no weight to the internal medicine examination report provided by consultative examiner Dr. Toor as it related to period of June 19, 2010 to the present, the ALJ reasoned that Dr. Toor was not able to consider in his evaluation the injuries Plaintiff sustained in the June 2010 shooting. Tr. 22, 245-48.

It is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of the witnesses," including with regard to the severity of

a claimant's symptoms. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).   Social Security regulations require Administrative Law Judges to follow a two-step process for evaluating pain and other limiting effects of symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(c)(3).   First, the ALJ must determine whether the objective medical evidence, *i.e.*, medical signs, laboratory findings, and other evidence, shows that a claimant suffers from a medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.   If the claimant does suffer from an impairment, the ALJ must then evaluate the intensity, persistence, or limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to work.   20 C.F.R. § 416.929(c)(1).   When doing do, the ALJ must consider all of the available evidence, including the claimant's medical history, medical signs and laboratory findings, and statements from the claimant, the claimant's treating source and other medical opinions, or other persons about how the symptoms affect the claimant. *Id.*

If a claimant's statements about his or her symptoms are not supported by the objective medical evidence, *i.e.*, suggest a higher level of severity than shown by the medical evidence, the ALJ must consider the other evidence and make a credibility assessment based upon the following factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment to relieve symptoms; (6) any measures taken by claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).   The ALJ's decision must set forth "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the [claimant] and to any subsequent reviewers the weight the [ALJ]

gave to the [claimant's] statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). No grounds for remand exist where "the evidence of record permits [a court] to glean the rationale for the ALJ's decision." *Monguer v. Heckler*, 722 F.3d 1033, 1040 (2d Cir. 1983).

Here, after considering all the evidence, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but did not credit his testimony regarding the intensity, persistence, and limiting effects of the symptoms to the extent they were inconsistent with RFC. Based upon the specific reasons and rationales offered by the ALJ for his finding on credibility and the wealth of supportive evidence in the record, I conclude that the ALJ ably resolved the evidentiary conflicts and reasonably appraised the credibility of the witnesses.

In this regard, she properly considered the treating records of Plaintiff's primary care providers and accorded them great weight. The treating physician rule provides that an ALJ should defer "to the views of the treating physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). A treating physician's opinion as to the nature and severity of a claimant's impairment is given controlling weight by the Commissioner, if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); SSR 96-2P; *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). The opinion of a consultative examiner can constitute substantial evidence supporting an ALJ's decision. *See Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995). The report of a consultative physician who examines the Plaintiff and reaches conclusions based upon a one-time examination may constitute substantial evidence in support of the ALJ's decision. *Monguer v. Heckler*, 722 F.3d at 1039. I agree with the Commissioner that the ALJ's

decision to give greatest weight to the consultative psychiatric evaluation of Dr. Ransom and to give the professional opinion of LMFT Smart, who was not an "acceptable medical source" (*see* 20 C.F.R. §§ 416.913(a), 416.927(a)(2); S.S.R. 06-03p, 2006 WL 239939) very little weight for the stated reasons, did not constitute reversible error.  I also agree with the Commissioner that the ALJ's decision to discount Dr. Toor's internal medicine report and findings as they related to the period of June 19, 2010 to the present because they did not take into account the injuries Plaintiff suffered in the June 2010 shooting, was proper and not error.

Finding that Plaintiff, even prior to the alleged onset date of December 31, 2010, had not worked at the level of substantial gainful activity, *i.e.*, no past relevant work, and additionally, his ability to perform all or substantially all of the requirements of light work had been impeded by additional limitations, and in order to determine the extent to which such limitations "erode[d] the unskilled occupational base," the ALJ asked the testifying VE whether jobs existed in the national economy for a hypothetical claimant with Plaintiff's age, education, work experience, and residual functional capacity.  Tr. 23.  Based upon the VE's testimony that light exertional level jobs, such as housekeeper/cleaner (20,000 jobs in New York State; 800,000 jobs nationally) or garment sorter (1300 jobs in New York State; 48,000 jobs nationally), existed in the national economy for an individual presenting with Plaintiff's factors, the ALJ concluded that Plaintiff was capable of making a successful adjustment to other work existing in significant numbers in the national economy and, consequently, a finding of disabled was not appropriate.  *Id.*

Therefore, for the reasons set forth herein above, the Court finds no reasons for reversal of the Commissioner's decision denying Plaintiff SSI, because he was not disabled since March 1, 2010.

IV.   **CONCLUSION**

For all of the foregoing reasons, and after careful consideration of the entire record, I find that the Commissioner's determination was supported by substantial evidence in the record and was not erroneous as a matter of law.   Accordingly, the Commissioner's determination is affirmed.  The Court hereby GRANTS Defendant's Motion for Judgment on the Pleadings (ECF No. 10).  The Court orders that Plaintiff's Complaint (ECF No. 1) be dismissed, and the Clerk of the Court is directed to close Civil Case No. 13-CV-6124.

IT IS SO ORDERED.

Dated: October 8, 2014
       Rochester, New York

HON. FRANK P. GERACI, JR.
United States District Judge

37